IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED
DEC 13 2013
David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | § | |
| | § | |
| | § | |
| VS. | § | CRIMINAL NO. B-13-441-1 |
| | § | |
| | § | |
| MIRTHA VERONICA NAVA-MARTINEZ, Defendant. | § | |
| | § | |
| | § | |

# ORDER

Mirtha Veronica Nava-Martinez pleaded guilty to attempting to smuggle a ten-year-old El Salvadorean female, Y.P.S., into the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).[1] This Court sentenced Nava-Martinez in accordance with the established federal procedure, the law, and the United States Sentencing Guidelines, and has purposefully waited until after signing that judgment before addressing the issue that is the subject of this Order.

On May 18, 2013, Nava-Martinez, an admitted human trafficker, was caught at the Brownsville & Matamoros Bridge checkpoint. She was trying to smuggle Y.P.S. into the United States using a birth certificate that belonged to one of her daughters. Nava-Martinez had no prior relationship with Y.P.S. and was hired by persons unknown solely to smuggle her into the United States. Nava-Martinez is a resident alien and this was her second felony offense in three years, having committed a food stamp fraud offense in 2011. She was to be paid for smuggling Y.P.S. from Matamoros to Brownsville, although the identity of her immediate payor and the amount are unknown. The details as to how Y.P.S. got to Matamoros, Mexico from El Salvador, and how she

---

[1]The Court will use the minor's initials to protect her identity.

was to get from Brownsville to Virginia were also not disclosed to the Court. This conspiracy was started when Patricia Elizabeth Salmeron Santos solicited human traffickers to smuggle Y.P.S. from El Salvador to Virginia. Salmeron Santos currently lives illegally in the United States. She applied for a tourist visa in 2000, but was turned down. Despite being denied legal entry into the United States, she entered the United States illegally and is living in Virginia.

Salmeron Santos admitted that she started this conspiracy by hiring alien smugglers to transfer her child from El Salvador to Virginia. She agreed to pay $8,500 (and actually paid $6,000 in advance) for these human traffickers to smuggle her daughter. The criminal conspiracy instigated by Salmeron Santos was temporarily interrupted when Nava-Martinez was arrested. Despite this setback, the goal of the conspiracy was successfully completed thanks to the actions of the United States Government. This Court is quite concerned with the apparent policy of the Department of Homeland Security (hereinafter "DHS") of completing the criminal mission of individuals who are violating the border security of the United States. Customs and Border Protection agents stopped the Defendant at the border inspection point. She was arrested, and the child was taken into custody. The DHS officials were notified that Salmeron Santos instigated this illegal conduct. Yet, instead of arresting Salmeron Santos for instigating the conspiracy to violate our border security laws, the DHS delivered the child to her—thus successfully completing the mission of the criminal conspiracy. It did not arrest her. It did not prosecute her. It did not even initiate deportation proceedings for her. This DHS policy is a dangerous course of action.

The DHS, instead of enforcing our border security laws, actually assisted the criminal conspiracy in achieving its illegal goals. The Government's actions were not done in connection with a sting operation or a controlled delivery situation. Rather, the actions it took were directly in

furtherance of Y.P.S.'s illegal presence in the United States. It completed the mission of the conspiracy initiated by Salmeron Santos. In summary, instead of enforcing the laws of the United States, the Government took direct steps to help the individuals who violated it. A private citizen would, and should, be prosecuted for this conduct.

This is the fourth case with the same factual situation this Court has had in as many weeks. In all of the cases, human traffickers who smuggled minor children were apprehended short of delivering the children to their ultimate destination. In all cases, a parent, if not both parents, of the children was in this country illegally. That parent initiated the conspiracy to smuggle the minors into the country illegally. He or she also funded the conspiracy. In each case, the DHS completed the criminal conspiracy, instead of enforcing the laws of the United States, by delivering the minors to the custody of the parent illegally living in the United States. In response to this Court's inquiry about this policy in the instant case, the Government responded with a copy of the 1997 *Flores v. Reno*, CV-85-4544-RJK, settlement agreement and a copy of a portion of the Homeland Security Act. No other explanation was offered—no doubt because there is no explanation. The DHS has simply chosen not to enforce the United States' border security laws.

This Court understands that the Government has previously entered into the *Flores* settlement regarding its practices, policies and regulations regarding the treatment and detention of unaccompanied minors. Since that order is apparently sealed, this Court will not quote in detail any specific language. Generally, that settlement requires the Government to release a minor to his or her parent, guardian, or relative, among others, in an order of preference established by the settlement documents. There is nothing in this settlement that prohibits the DHS from arresting Salmeron Santos–the individual who initiated this conspiracy–or from at least initiating deportation

proceedings. There was also no explanation of why this settlement agreement–whose terms terminated five years after the date of final court approval—is still even effective. [*Flores* Settlement Agreement ¶ 40].[2] The Government also implies by its response to the Court that the Homeland Security Act of 2002 somehow authorizes its participation in this conspiracy. Again, there is nothing in this Act that directs and authorizes the DHS to turn a blind eye to criminal conduct, and certainly nothing that compels it to participate in and complete the mission of a criminal conspiracy or to encourage parents to put their minor children in perilous situations subject to the whims of evil individuals.[3] These actions are both dangerous and unconscionable.

In each of the four cases, the Government also incurred significant expense to help complete the conspiracy. In all cases when the Government apprehended some of the traffickers, the Government transported the children across the country to unite them with a parent (or parents) who

---

[2]The Government did not provide this Court with the actual, final court order that approved the settlement, so it is unclear when its terms expired.

[3]The only portion of the Act to which the Government cites contains a provision concerning "reuniting unaccompanied alien children with a parent abroad . . . ." 6 U.S.C.A. § 279(b)(1)(H) (West 2013) (emphasis added). More importantly, the relevant section to which this Court has been directed concerns "the care of unaccompanied alien children." *Id.* § 279(a). "Unaccompanied alien child" is a defined term. *Id.* § 279(g)(2). Under the Act, that term refers to a child under the age of eighteen who has no lawful immigration status and with respect to whom:

> (i) There is no parent or legal guardian in the United States; or
> (ii) No parent or legal guardian in the United States is available to provide care and physical custody.

*Id.* § 279(g)(2)(C).

All of the children in question in the cases before this Court were not "unaccompanied alien children" as defined by this Act. All of them had at least one parent in the United States. Furthermore, they evidently all had a parent in the United States available to care for them because the DHS delivered the children to them. Thus the Act cited to this Court has no application and certainly provides no excuse for the Government to continue the criminal activity of the trafficking conspiracy.

was in the country illegally. In one situation, the Government flew a child to multiple locations in different parts of the United States. The taxpayers of the United States suffer the expense of delivering these minors. This expense includes not only the cost of paying travel, room and board for the children, but it may also, according to the information supplied to this Court in yet another case, include the salary and travel expenses of a guardian to accompany them. This is an absurd and illogical result. The DHS could reunite the parent and child by apprehending the parent who has committed not one, but at least two different crimes. It would be more efficient for the Government to arrest the individuals who are not only in the country illegally, but while in the country illegally are also fostering illegal conspiracies. It would also be much cheaper to apprehend those co-conspirators and reunite them at the children's location. Yet, it neither prosecutes nor deports the wrongdoer.[4]

The DHS is rewarding criminal conduct instead of enforcing the current laws. More troubling, the DHS is encouraging parents to seriously jeopardize the safety of their children. While Y.P.S. was transported in a car, others are made to swim the Rio Grande River or other bodies of water in remote areas. This concern for the safety of these individuals is not fanciful or theoretical; it is a real and immediate concern. As this Court waited for the judgment to be prepared before it

---

[4]Subsequent to this Court's inquiry into this situation, the United States Attorney's Office has apparently "requested" the DHS place Salmeron Santos in "immigration proceedings." There has been no word as to whether this has been done, but the Government has informed the Court that it will not prosecute these wrongdoers. The Court has not been informed as to the identity of what individual or office initiated this policy, so it must refer to the DHS generically. In another one of the cases, the Government again informed the Court the result would be no prosecutions and only a "request" that immigration proceedings be instigated. There is no indication as to whether this request will be honored. There is not even an indication that the DHS will seek reimbursement of the costs that taxpayers have incurred. That being the case, the DHS should cease telling the citizens of the United States that it is enforcing our border security laws because it is clearly not. Even worse, it is helping those who violate these laws.

released this opinion, two illegal aliens drowned, two more are missing, and a three-year-old El Salvadorean toddler was found abandoned by smugglers—each event occurring just outside of Brownsville.[5]

This Court takes no position on the topic of immigration reform, nor should one read this opinion as a commentary on that issue. That is a subject laced with controversy and is a matter of much political debate which is not the province of the judicial branch. Nevertheless, the failure by the DHS to enforce current United States law concerns this Court for three unassailable reasons.

First, and most importantly, these illegal activities help fund the illegal drug cartels which are a very real danger for both citizens of this country and Mexico.

> Mexican cartels control most of the human smuggling and human trafficking routes and networks in Texas. The nature of the cartels' command and control of human smuggling and human trafficking networks along the border is varied, including cartel members having direct organizational involvement and responsibility over human smuggling and human trafficking operations, as well as cartel members sanctioning and facilitating the operation of human smuggling and human trafficking organizations. In other circumstances, human smuggling organizations are required to pay the cartels for operating their networks and routes in their territory.[6]

This Court need not list the dangers involved for minors, or even adults, who are being smuggled into the United States. In the last year, this Court has seen instances where aliens being smuggled were assaulted, raped, kidnapped and/or killed. This Court's antidotal experiences, however, are not unique.

---

[5]*See, e.g.*, Kayleigh Sommer, *Border Crossing Deaths; One Hospitalized*, BROWNSVILLE HERALD, Dec. 11, 2013, at A2; Marcy Martinez, *Child Smuggled then Abandoned at Laundromat*, Valley Central (Nov. 6, 2013 10:52 PM), http://www.valleycentral.com/news/story.aspx?id=968343#.Uqsq4NJDs3o.

[6]Tex. Dept. of Pub. Safety, Texas Public Safety Threat Overview (2013), at 24–25, http://www.txdps.state.tx.us/director_staff/media_and_communications/threatoverview.pdf.

> Mexican cartels, transnational gangs, human trafficking groups, and other criminal organizations engage in a wide range of criminal activity in Texas, including murder, kidnapping, assault, drug trafficking, weapon smuggling, and money laundering. However, by far the most vile crime in which these organizations and other criminals are engaged is the exploitation and trafficking of children. These crimes are also carried out and enabled by prostitution rings, manufacturers and viewers of child pornography, sexual predators, and other criminals. Regardless of who perpetrates these crimes or their motives, this category of criminal activity is especially heinous, as it takes advantage of children and subjects them to violence, extortion, forced labor, sexual assault, or prostitution.
>
> * * * *
>
> The methods and means used by smugglers to transport and hold aliens subject them to high degrees of risk. Unsafe vehicles and drivers, squalid conditions in stash houses, rugged terrain, and harsh elements create dangerous circumstances. Hundreds of illegal aliens have died in Texas and elsewhere along the border. Since FY2008, 2,008 deaths of suspected illegal aliens have been reported along the border, including 839 in Texas sectors. These include deaths due to environmental exposure (heat and cold), terrain and motor-vehicle-related deaths, drownings, other causes, and cases in which skeletal remains were recovered or a cause could not be determined. FY2012 was a record year for such deaths in Texas sectors, increasing 198 percent from 91 in FY2010 to 271 in FY2012. An even greater number of illegal aliens have been rescued from such conditions by law enforcement; since FY2008, 6,375 people have been rescued along the border, including 3,020 in Texas.
>
> In addition to these dangerous methods and means, smugglers also regularly use violence, extortion, and unlawful restraint against illegal aliens. In some cases, they are forced to perform labor, and females—including minors—may be sexually assaulted. Some are subjected to physical assaults if payments are not received, and several have died while being held in stash houses in Texas. And just as drug traffickers may attempt to steal drug loads from rival traffickers, criminals sometimes attempt to steal or hijack groups of aliens from smugglers.[7]

Time and again this Court has been told by representatives of the Government and the defense that cartels control the entire smuggling process. These entities are not known for their concern for human life. They do not hire bonded childcare providers to smuggle children. By fostering an atmosphere whereby illegal aliens are encouraged to pay human smugglers for further

---

[7] *Id.* at 12, 24–25 (emphasis added).

services, the Government is not only allowing them to fund the illegal and evil activities of these cartels, but is also inspiring them to do so. The big economic losers in this scenario are the citizens of the United States who, by virtue of this DHS policy, are helping fund these evil ventures with their tax dollars. The overall losers, who endure the consequences of this policy, are the citizens on both sides of the border who suffer from the nefarious activities of the cartels.[8]

Second, the DHS's current policy undermines the deterrent effect the laws may have and inspires others to commit further violations. Those who hear that they should not fear prosecution or deportation will not hesitate, and obviously have not hesitated, to act likewise. They perceive that they have nothing to lose but some time and effort. If the human traffickers are successful, so much the better—mission accomplished. Even if their co-conspirators are unsuccessful, the Government will finish the job of the human traffickers—mission still accomplished. It is no wonder these cases are proliferating. Further, this policy is encouraging individuals to turn their children over to complete strangers—strangers about whom only one thing is truly known: they are criminals involved in a criminal conspiracy.

Children, such as Y.P.S., are especially at risk.

> Some children are more vulnerable to exploitation, such as unaccompanied alien children (UAC). Since FY2010, there have been 58,763 UAC apprehensions along the US-Mexico border, including 33,474 in Texas sectors. <u>The number of UAC apprehensions in Texas increased 81 percent from FY2010 to FY2012</u>. UAC apprehensions have also become increasingly concentrated in the state. Texas sectors accounted for 65 percent of all UAC apprehensions along the border in FY2012, up

---

[8]The Court notes parenthetically that it is also common knowledge that these human smugglers will occasionally smuggle methamphetamine, heroin or other illegal and dangerous substances at the same time they smuggle humans. Both Congress and the Fifth Circuit Court of Appeals have recognized, albeit in a different context, that the mixture of children and drug dealers is a grave danger even when no drugs are being distributed. *United States v. Wake*, 948 F.2d 1422, 1433 (5th Cir. 1991).

from 48 percent in FY2010.[9]

An 81% increase in two years should tell the DHS that their policy is failing. If they persist in this policy, more children are going to be harmed, and the DHS will be partly responsible because it encourages this kind of Russian roulette.

Finally, this policy lowers the morale of those law enforcement agents on the front line here on the border. These men and women, with no small risk to their own safety, do their best to enforce our laws and protect the citizens of the United States. It seems shameful that some policymaker in their agency institutes a course of inaction that negates their efforts. It has to be frustrating to those that are actually doing the work of protecting Americans when those efforts are thwarted by a policy that supports the lawbreakers.

This Court is not unsympathetic to any individual or entity taking action that is in the best interests of a minor child; nor is it this Court's goal to divide or separate family members. But the decision to separate Salmeron Santos from Y.P.S. was made years ago, and it was made by Salmeron Santos. She purposefully chose this course of action.[10] Her decision to smuggle the child across the border, even if motivated by the best of motives, is not an excuse for the United States Government to further a criminal conspiracy, and by doing so, encourage others to break the law and endanger

[9]*Id.* (emphasis added).

[10]This Court will not address an issue that some may raise: whether it is in the best interests of Y.P.S. to be reunited with a parent who had previously abandoned that child in a different country. Nor will this Court address the issue as to whether a responsible parent would place her child not only in the care of total strangers, but also in the care of total strangers which she knows are criminals. While there could be many reasons, some not without merit, for following such a course, many would certainly argue that most courts in the United States would not find that to be good parenting.

additional children. To put this in another context, the DHS policy is as logical as taking illegal drugs or weapons that it has seized from smugglers and delivering them to the criminals who initially solicited their illegal importation/exportation. Legally, this situation is no different. This Court is not blind to the needs of a minor child, nor is it suggesting that a child should be punished for the crimes of her parent. Nevertheless, neither the *Flores* settlement nor a concern for common decency compels the Government to not only aid, but also reward an individual for initiating a scheme to break the laws governing the border security of this country. Further, neither compels the Government to aid the drug cartels who control this human trafficking.

Finally, the Court is aware that prosecutors and law enforcement officers, including those here on the border, frequently use their discretion to defer the prosecution or arrest of individuals. This Court is not opposed to the concept of prosecutorial discretion, if that discretion is exercised with a sense of justice and common sense. Nevertheless, it is not aware of any accepted legal principle, including prosecutorial discretion, that not only allows the Government to decline prosecution, but further allows it to actually complete the intended criminal mission. The DHS should enforce the laws of the United States—not break them.

Signed this 13th day of December, 2013.

Andrew S. Hanen
United States District Judge